ORAL ARGUMENT REQUESTED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
---------------
NO. 12-5057
---------------

ROXANN FRANKLIN MASON

      Appellant,


   v.


RAYMOND MABUS, JR.

      Appellee.


_____

APPELLANT'S BRIEF
_____


Lisa Alexis Jones, Esq.
Lisa Alexis Jones, PLLC
D.C. Bar No. 421002
1230 Avenue of the Americas
7th Floor
New York, N.Y.  10020
(646) 756-2967
(888) 755-6778 Fax
orbitcv@erols.com

*Counsel for Appellant*

Civil Action No. 96-02505 (RWR)

# TABLE OF CONTENTS

Page

Cases Cited..............................................................................................ii

Statutes and Regulations…..………………………………………………..iv

Statement of Subject Matter and Appellate Jurisdiction…………………………...1

Statement of the Issues…………………………………………………………..2

Statutes and Regulations…………………………………………………………3

Statement of the Case…………………………………………………………6

Statement of the Facts…………………………………………………………9

    I.    Franklin Mason's Title VII Claim……………………………...…………9

    II.    Franklin Mason's Title VII Litigation………………………………19

    III.    Franklin Mason's Post-Settlement Employment……………………26

    VI.    Franklin Mason's Motions to Enforce Settlement Agreement in District Court.........................................................................28

    IV.    Litigation in the Court of Federal Claims…………………...…34

Summary of the Argument…………………………………………………..36

Argument.............................................................................................37

    I.    Standard of Appellate Review……………………………………37

    II.    The District Court Possessed Inherent Power to Enforce Franklin Mason's Title VII Consent Decree against the United States. …………………………37

III.    The Navy Violated The Consent Decree When
It, In Bad Faith, Induced Her To Settle Her
Title VII Case With Illusory Promises Of
A Meaningful Position Segregated From
Her Tortfeasors That Did Not Exist And
The Navy Admits It Had No Intention Of Providing.........................43

Conclusion .........................................................................................................47

Certificate of Service ...................................................................……...48

Certificate of Compliance…………………………………….…....………49

## CASES CITED*

*Akinseye v. Dist. of Columbia*
339 F.3d 970 (D.C. Cir. 2003)……………………………………………34

*Beckett v. Air Line Pilots Ass'n*
995 F.2d 280 (D.C. Cir. 1993)……………………………………………41

*Blodgett v. United States*
 101 F.3d 713 (Fed. Cir. 1993)……………………………………………42

*Brown v. United States*
389 F.3d 1296 (D.C. Cir. 2004)………………………………...……40

*Buckhannon Board & Care Home v.*
*West Virginia Dep't of Health and Human Services*
 532 U.S. 598 (2001)…………………………………………………….....41

*Cooter & Gell v. Hartmarx Corp.*
 496 U.S. 384 (1990)…………………………………………………...38-39

*EEOC v. Product Fabricators*
666 F.3d 1170 (8th Cir. 2012)…………………………………………..40

*Franklin-Mason v. Penn*

_____

* Cases chiefly relied upon denoted by an asterisk.

616 F. Supp.2d 97 (D.D.C. 2009)………..………………………………….33, 34

*Greenhill v. Spelling*
482 F.3d 569 (D.C. Cir. 2007)……………………………………………….40

*Gen. Elec. Co. v. EPA*
360 F.3d 188 (D.C. Cir. 2004)……………………………………………….37

*Hansson v. Norton*
 411 F.3d 231 (D.C. Cir. 2005)…………………………………………….32, 40

*Kokkonen v. Guardian Life Insurance Co.*
 511 U.S. 375 (1994)………………………………………………..32, 34, 36, 38

*Mynard v. Office of Personnel Mgmt.*
 2009 WL 3320583 at *5 (Fed. Cir. 2009)…………………………….......42

*National Audubon Society v. Watt*
678 F.2d 299 (D.C. Cir. 1982)……………………………………………….40

*Serono Lab v. Shalala*
158 F.3d 1313 (D.C. Cir. 1998)…………………………………………...37

*Shaffer v. Veneman*
325 F.3d 370 (D.C. Cir. 2003)……………………………………………….42

*Smyth v. Rivero*
 282 F.3d 268 (4th Cir. 2002)……………………………………………….41

*Stewart v. O'Neill*
225 F. Supp 2d 6 (D.D.C. 2002)…………………………………………….42

*Rochon v. Gonzales*
 438 F.3d 1211 (D.C. Cir 2006)…………………………………...32, 34, 40

*Rufo v. Inmates of the Suffolk County Jail*
 502 U.S. 367 (1992)………………………………………………………….41

*United States v. Bormes*
 ___ U.S. ___ (2012)………………………………………………...41-42

*United States v. Miami*
 664 F.2d 435 (5th Cir. 1981)………………………………………………...40

*VanDesande v. United States*
 673 F.3d 1342 (Fed. Cir. 2012)……………………………………………..42

*Women's Equity Action League v. Bell*
 743 F.2d 42 (D.C. Cir. 1984)………………………………………………...40

## <u>STATUTES AND REGULATIONS</u>

 28 U.S.C. §1291……………………………………………………………1, 3

 28 U.S.C. §1331……………………………………………………………1, 3

 28 U.S.C. §1346………………………………………………………....3, 39

 28 U.S.C. §1491(a)(1)……….…………………………………………..3, 34, 39

 42 U.S.C. § 2000e…..………………………………………………………1, 4

 Fed. R. Civ. P. 41…………….………………………………………………39

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This appeal is from a Judgment issued by the Honorable Richard W. Roberts of the United States District Court for the District of Columbia on January 27, 2012.  The district court had original jurisdiction pursuant to 42 U.S.C. §2000e *et seq*. and 28 U.S.C. § 1331 to adjudicate the federal claims under Title VII of the United States Civil Rights Act asserted by Plaintiff-Appellant Roxann J. Franklin-Franklin Mason ("Franklin Mason") against Raymond Mabus, Jr., Secretary of the Department of Navy ("the Navy") and inherent jurisdiction to enforce its Stipulation Agreement and Order dismissing the case.  This Court has jurisdiction over Franklin Mason's appeal from the district court's judgment dismissing her motion to enforce a consent decree filed by Franklin Mason and the Navy, pursuant to 28 U.S.C. § 1291, which grants this Court jurisdiction of appeals from final decisions of district courts of this Circuit.  A notice of appeal was filed on February 23, 2012.

1

## STATEMENT OF THE ISSUES

I.     WHETHER THE DISTRICT COURT POSSESSED INHERENT
       JURISDICTION TO ENFORCE A TITLE VII CONSENT DECREE
       AGAINST THE UNITED STATES.

II.    WHETHER THE NAVY VIOLATED THE CONSENT DECREE WHEN
       IT INDUCED FRANKLIN MASON HER TO SETTLE HER TITLE VII
       CASE WITH ILLUSORY PROMISES.

## STATUTES AND REGULATIONS

I.     28 U.S.C. §1291

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court.

II.     28 U.S.C. § 1331

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

III.     28 U.S.C. §1346

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

IV.     28 U.S.C. §1491(a)(1).

The United States Court of Federal Claims shall have jurisdiction to render

judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

V.     42 U.S.C. §2000e-2(a)(1)

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

VI.     42 USC § 2000e–3 - Other unlawful employment practices

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made

4

a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

VII.    Federal Rule of Civil Procedure 41(a)(2)

By Court Order; Effect. [A]n action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper.  Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

## STATEMENT OF THE CASE

This was an action against appellee, Raymond Mabus, Jr., Secretary of the Department of the Navy, under Title VII of the United States Civil Rights Act for acts of discrimination, hostile work environment, retaliation and constructive termination against appellant, Roxann J. Franklin-Franklin Mason.  On October 31, 1996, Franklin Mason filed suit against appellee, her former employer, for its willful and malicious discriminatory acts against her on the basis of her race and gender.  Franklin Mason submitted that the Navy violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, when the Military Sealift Command of the Department of the Navy failed to promote her to a position to which she was qualified; created a hostile working environment; took acts of reprisal against her; and constructively discharged Franklin Mason from her employment.[1]

The case was assigned to the Honorable Emmet G. Sullivan, and a pretrial motion for summary judgment by the Navy was made on depositions and documentary evidence.  The trial court partially denied the Navy's motion for summary judgment.  On April 7, 1999, the parties filed a Stipulation of Settlement and Order, and on or about April 15, 1999, Judge Sullivan approved and entered the Order.

On December 10, 1999, Franklin Mason filed an emergency motion to enforce the terms of the Stipulation of Settlement and Order.  On May 12, 2000,

Judge Sullivan denied without prejudice Franklin Mason's motion to enforce the terms of the Stipulation of Settlement and Order after ordering the parties to meet and confer in an attempt to resolve the issues of settlement implementation.

On May 21, 2001, Franklin Mason filed another motion to enforce the Stipulation of Settlement and Order. On October 24, 2001, Judge Sullivan denied Franklin Mason's motion to enforce the Stipulation of Settlement and Order but granted her leave to file a supplemental motion to enforce the Stipulation of Settlement and Order. On November 9, 2001, Franklin Mason filed her supplemental motion to enforce and for sanctions.

On July 8, 2002, Judge Sullivan recused himself from Franklin Mason's case, and the Honorable Judge Richard Roberts was reassigned the matter. On January 30, 2003, Judge Roberts referred Franklin Mason's motion to Magistrate Judge John M. Facciola for Report and Recommendation. Evidentiary hearings on Franklin Mason's motion were held on February 2, 3, 4 and April 8, 2005 before Magistrate Facciola. On March 21, 2006, the Magistrate Judge filed a Report and Recommendation on Franklin Mason's motion to enforce the Stipulation of Settlement and Order.

On May 22, 2009, Judge Roberts ordered Franklin Mason's case transferred to the United States Court of Federal Claims. On September 29, 2009, Franklin Mason's motion was transferred and assigned to the Honorable Judge Susan G.

7

Braden.  On October 27, 2009, Franklin Mason filed an "Amended" Transfer Complaint in the Court of Claims.  On July 23, 2010, Judge Braden transferred Franklin Mason's matter back to the United States District Court for the District of Columbia.  On January 27, 2012, Judge Roberts issued a Final Order, denying Franklin Mason's motion to enforce the Stipulation of Settlement and Order and dismissing the transfer complaint.  A notice of appeal was filed on February 21, 2012.

The aforementioned is the procedural posture of the case at bar.

## STATEMENT OF THE FACTS

### I.     Franklin Mason's Title VII Claim.

In 1978, Roxann Franklin Mason was selected to fill the position of Statistical Assistant, GS-5, in the Statistics Division of Office of the Comptroller, Military Sealift Command ("MSC") of the United States Department of Navy. Franklin Mason Tr. pp. 19:5-20:3.1  In September 1978, when Plaintiff began her employment in the Statistics Division, there was only one African American employed in a professional series in MSC. Franklin Mason Tr. p. 20:13-19.

As a GS-5, Statistical Assistant, Franklin Mason primarily performed coding and data entry for the Petroleum Oil Liquid ("POL") and Cargo desks. Franklin Mason Tr. 22:10-15.  Franklin Mason later that year applied for a vacant GS-7 Statistician position advertised in the Statistics Division. Franklin Mason Tr. pp. 22:20-24:16.  The vacant position had been vacated by a Caucasian male who was transferred to serve as MSC's comptroller in Europe. Franklin Mason Tr. pp. 23:11-24:2.  The GS-7 Statistician position was later canceled and not filled. Franklin Mason Tr. p. 24:20.

In 1979, Franklin Mason applied for and was selected to a GS-5 Statistician position.  This down-graded position was identical to the previously announced GS-7 position in 1978. Franklin Mason Tr. p. 26:5-20.  After a year in the position,

Franklin Mason was required to compete for a promotion to the GS-7 level, although a career-ladder promotion in a professional series did not require competition. Franklin Mason Tr. p. 27:1-7.  Indeed, Caucasian males within the Office of the Comptroller obtained their career-ladder promotions within one year, without competing, such as Joel Flegal and Donald Petska. Franklin Mason Tr. p. 27:11-12; (Flegal) p. 727:2; (Petska) p.737:15.

As a GS-7, Statistician, Franklin Mason was responsible for the POL desk, and the strategic petroleum reserve ("SPR").  Thereafter, Franklin Mason was promoted to the GS-9 level, and then to the GS-11 level.  As a GS-9, Statistician, Franklin Mason's duties expanded beyond the POL and SPR desks to include responsibility for afloat prepositioning.  During this period, Franklin Mason was rated by her supervisor, Ed Havens, either outstanding or highly satisfactory.  As a result of her outstanding performance, Franklin Mason was promoted to the GS-11 level, and then to the GS-12 level. Franklin Mason Tr. p. 32:9-18.  As a GS-12, Statistician, Franklin Mason's duties were further expanded to include the Naval Fleet Auxiliary and the Scientific Support. Franklin Mason Tr. p. 33:22- 34:6.

In 1986, in connection with the performance of her GS-12 duties, Franklin Mason received an evaluation from Havens that contained outstanding in all of her critical elements.  She was, nevertheless, only given an overall rating of highly

---

[1] The parties have agreed to the deferred filing a Joint Appendix.

satisfactory.  This was a violation of the Navy's personnel practices and policies. Franklin Mason Tr. p. 34:9-22; (Mutakabbir) pp. 467:2-468:22.  Franklin Mason raised her concerns about her performance rating with Havens and Robert Hofman, a Caucasian male and her second-level supervisor.  When management failed to satisfactorily address her concern, Franklin Mason filed a grievance. Franklin Mason Tr. pp. 35:1-36:11; Franklin Mason Tr. p. 35:7-8; (Mutakabbir) pp. 467:16-468:22; see also Exhibit 3.  The unfair rating was never modified. Franklin Mason Tr. p. 36:16-18.

In 1987, Flegal was promoted to Comptroller of Europe.  At the time of his transfer, Flegal was a GS-13. Franklin Mason Tr. p. 52:4-7.  Prior to his departure in July 1987, Flegal and Franklin Mason discussed the vacancy that would be created by his departure.  Flegal told Franklin Mason that he would train her on his cargo duties and that "if and when [his] position became available, she'd be the most qualified."  Franklin Mason Tr. p. 52:15-53:4.  Further, Franklin Mason's supervisor, Ed Havens, designated her acting director in his absence. Franklin Mason's Motion for Summary Judgment, p. 18.

In June 1987, one month before Flegal's departure, the GS-13, Statistician position was advertised. Franklin Mason Tr. pp. 63:7-64:11; see also Exhibit 2, June 17, 1987 Vacancy Announcement for Statistician, GM-1530-13.  Franklin Mason applied for the position. Franklin Mason Tr. p. 64:12-20.  Franklin Mason

11

was subsequently told by Havens that the application of another candidate had been "lost" and that the vacancy announcement would be cancelled and re-advertised.  Prior to the cancellation of the first vacancy announcement for the GM-13, Statistician position, Franklin Mason had been certified as "most qualified" to fill the position. Franklin Mason Tr. pp. 64:21-65:15; see also Exhibit 2, Candidate Transmittal Form.

A second vacancy announcement was issued. See Exhibit 2, September 16, 1987 Vacancy Announcement for Statistician, GM-1530-13.  The three African American GS-12's in the Statistics Division, including Franklin Mason, were the only applicants.  Each candidate was rated qualified, and Franklin Mason was rated highest qualified. Franklin Mason Tr. pp. 69:12-70:6.

On January 27, 1988, William Savitsky, a Caucasian male, the MSC Comptroller and selecting official, informed Franklin Mason that the GM-13 Statistician position had been canceled and that Donald Petska, a Caucasian male with substantially less experience and training than Franklin Mason, was being non-competitively transferred from the Budget Division into the Statistics Division to fill the position. Franklin Mason Tr. p. 89:4-7 and 90:3-5.  Savitsky had no familiarity with the qualifications of Franklin Mason or the other candidates. (Savitsky) pp. 853:10-13, 858:4-8, 863: 5-9, 820:6-16, 819:11-17.   Indeed,

Savitsky admitted "he did not consider anyone else for the position other than Petska." (Savitsky) pp. 929:9, 814:6-7, 948:16-949:17; see also Exhibit 8, SF-171 of Petska. Curiously, Petska did not even want the position, and Savitsky and Hofman had to essentially bribe Petska to accept it. See January 29, 1988, Memorandum from William Savitsky; (Petska) pp. 757:21-758:12 and 781:16-19.

In February 1988, Franklin Mason filed a complaint of discrimination based on race and gender. (Franklin Mason) p. 94:14-95:3.

Thereafter, the environment Franklin Mason was required to work in deteriorated and became increasingly hostile. The hostility created by the filing of her complaint left her despondent. Franklin Mason Tr. p. 99:20-22, p. 98:15- 99: 6; (Petska) p. 762:1-7. On February 29, 1988, Franklin Mason sought medical treatment and was diagnosed with an anxiety disorder and depression. Her physician recommended that she see a psychiatrist and advised her not to return to work. Franklin Mason Tr. pp. 112:16-113:5; Franklin Mason Tr. pp. 109:11-112:15. Based on the advice of her doctors, Franklin Mason did not return to work, and she, her husband and her doctor repeatedly advised her supervisors about the need for her medical leave. Franklin Mason Tr. pp. 113:5-114:1.

Seeing an opportunity to further harass Franklin Mason, Hofman and Savitsky embarked on a spectacle of excessive and duplicative requests for medical information to support her leave request. Franklin Mason Tr. pp. 114:2-7, 119:4-

13.  In response, Franklin Mason's doctors and lawyer responded to repeated and non-sensical requests for medical information detailing Franklin Mason's complaints, the clinical findings and assessment, diagnosis, the impact of the medical condition on life activities, and an estimated date of recovery. See Exhibit 10 Letter from Dr. John A. Jackson, Jr; Franklin Mason Tr. pp. 120:12-121:6.

In June 1988, Franklin Mason returned to work.  On that same day, Franklin Mason received from Hofman a letter of proposed removal.  Despite the plethora of information submitted by Franklin Mason, her doctors and attorney relating to her medical impairment, Hofman claimed that Franklin Mason had failed to sufficiently document her medical condition in support of her previously approved medical leave without pay and was converting all 472 hours of her approved leave without pay to AWOL status. Franklin Mason Tr. pp. 133:20-134:3; see also Exhibit 13, June 6, 1988, Proposed Removal Letter from Robert Hofman ("Proposed Removal Letter").

In the meantime, on July 15, 1988, Savitsky detailed Franklin Mason to the Operations Division to serve as a Marine Transportation Specialist, GS-12, and provided her with a position description. Franklin Mason Tr. p. 139:21-141:20; see also Exhibit 14, July 15, 1988, Memorandum from William Savitsky and Accompanying  Position Description For Marine Transportation  Specialist,  GS-12.  On the day Franklin Mason reported for duty in the Operations Division, she

14

was handed a different memorandum from Hofman that she would be going into an "unestablished" position. Franklin Mason Tr. p. 142:15-20; see also Exhibit 16, July 18, 1988, Memorandum from Robert Hofman.  Franklin Mason understood that she would still be performing the duties of a GS-12, Marine Transportation Specialist.  Franklin Mason also understood that her detail was a 90-day temporary assignment. Franklin Mason Tr. p. 143:16-144:2.[2]

Instead of being assigned GS-12 level work, Franklin Mason received clerical and data entry work. Franklin Mason Tr. p. 163:9-12; (Golie) p. 967:4-11. Franklin Mason complained about the menial work assignments she was receiving. Indeed, during one entire week, Franklin Mason was not given *any* work to do and her supervisor advised that he *had* no more work to assign Franklin Mason because of the selection of the Admiral's secretary, a GS-5, Caucasian female, into a GS-5 upward mobility position. Franklin Mason, then a GS-12, step 10, was forced to give up her cubicle for the GS-5.  Franklin Mason was seated, then, with the secretaries. Franklin Mason Tr. p. 166:13-20; see also Exhibit 17, February 3, 1989, Memorandum from Robert Greer, Jr.  Content to let her languish, Savitsky and Hofman ignored recommendations that Franklin Mason be reassigned. (Bullenkamp) pp. 1023:12- 1024:9.

---

[2] Franklin Mason remained in that position until her constructive termination over a year later. Franklin Mason Tr. p. 143:16-144:2.

On September 9, 1988, Savitsky advised Franklin Mason that on September 21, 1988, he would be deciding the proposed removal action. Franklin Mason Tr. p. 152:2-13; see also September 9, 1988, Letter from William Savitsky.   On September 20, 1988, Franklin Mason's physician provided Savitsky with additional information to his continuing requests. See Exhibit 10, September 20, 1988, Correspondence from Dr. John A. Jackson, Jr.  Savitsky, however, continued to request additional medical information although Franklin Mason had even provided the Navy with a written release to obtain any medical information it deemed necessary. See Exhibit 15, December 15, 1988, Memorandum from Roxann J. Franklin-Mason.

In November 1988, Franklin Mason applied for a vacant GM-14, Supervisory Statistician position in the Statistics Division. Franklin Mason Tr. p. 172:6-20; see also Exhibit 18, November 9, 1988, Supervisory Appraisal, and Vacancy Announcement for GM-1530-14, Supervisory Statistician Position.  At the time she applied for the position, Donald Petska had been in the position in an acting capacity since April 1988.   Franklin Mason's application was denied because she had not been in a GM-13 position for at least a year and failed to meet the position's time-in-grade requirements. See Exhibit 18, Notification to Roxann Franklin-Mason Re: Application For GM-1530-14.  Donald Petska was ultimately selected for the GM-14, Supervisory Statistician position.  Petska's selection was

not surprising. By 1984, there was only one African American male GM-13 at MSC. There were no African American GS-14s or GS-15s. (Mazyck) p. 549:8-13. And, between 1984 and 1987, MSC had hired or promoted thirty-two new GS-14s. All of them were Caucasian. (Mazyck) p. 550:1-5.

On New Year's Eve, 1988, Franklin Mason received yet another demand from Savitsky for additional medical documentation. See Exhibit 15, Memorandum from William Savitsky. Finally, Franklin Mason had had enough and told Savitsky that she had no further documentation to provide. She also told him that she considered his continuing requests for additional medical documentation to be retaliatory and was amending her EEO charge to include allegations of retaliatory harassment. See Exhibit 15, January 4, 1989, Letter from Edward H. Passman.

Thereafter, Gerald Alexander, Director of Labor Relations for the Naval District of Washington, was assigned to investigate whether Franklin Mason could be charged with being AWOL. (Alexander) pp. 391-392. Based upon his investigation, Alexander understood that Savitsky wanted Franklin Mason terminated. (Alexander) pp. 395:4-397:5. Franklin Mason refused Alexander's attempts to convince her to resign, and Savitsky expressed his intention to go through with Franklin Mason's removal. Savitisky, as well, overruled Alexander's attempts to get Franklin Mason transferred. (Alexander) pp. 400:12- 402:10.

17

From May 1989 to July 1989, Franklin Mason repeatedly complained to Vice Admiral P.D. Butcher about her intolerable working conditions. Franklin Mason Tr. pp. 182:21-183:2; see Exhibit 19, Memoranda from Roxann J. Franklin-Mason.  Butcher met with Franklin Mason several times to discuss her concerns about resolving her employment dispute, the 472 hours of AWOL, the assignment of clerical duties, as well as the lack of any investigation into her EEO complaints. At one meeting in August 1989 with Butcher, an EEO officer and Franklin Mason and her legal counsel, Franklin Mason was presented with the sole option of returning to the Statistics Division. Franklin Mason Tr. pp. 186:21-187:14. Franklin Mason believed that continued supervision by Savitsky, Hofman and Petska was untenable and proposed a transfer out of MSC. See Exhibit 20, March 31, 1989, Letter from P. D. Butcher.  After all, by July 1989, Franklin Mason still had little to no work to do, and Franklin Mason's co-workers recalled that she was "bored out of her brains." (Bullenkamp) p. 1026:14-1027:6; (Carter) p. 439:17-21. The Navy rejected any proposal other than a return to Statistics.  Left with no other reasonable alternative, Franklin Mason resigned.  In her August 10, 1989, letter of resignation, Franklin Mason wrote:

> I have been assigned menial/clerical duties and continually harassed for over a year. . . . my EEO complaints filed over a year and a half ago are just now beginning to be investigated. . . . MSC refuses to withdraw its pending proposed removal. . . . and Savitsky's vindictive behavior during [our] August 4, 1989 meeting convinced me that I

18

would only be subject to further discrimination and reprisals if returned to the [Statistics Division]. . . .  I consider my resignation to be a constructive termination due to intolerable working conditions.

Franklin Mason Tr. pp. 195:13-197:1; see also Exhibit 21, August 10, 1989, Resignation Memorandum from Roxann Franklin-Mason, and August 22, 1989, Notification of Personnel Action.

## II.     Franklin Mason's Title VII Litigation.[3]

From 1987 to 1996, Franklin Mason litigated her Title VII claim before the Equal Employment Opportunity Commission.  The Commission held hearings on Franklin Mason's claims in August 1995.  On July 3, 1996, Administrative Judge Marlin D. Schreffler (the "AJ") issued a post-hearing decision. EEOC Decision, dated July 3, 1996.  The AJ found that Franklin Mason had established by a preponderance of the evidence that the Navy had unlawfully discriminated against her on the basis of her race and sex when it:

1)     Failed to select her for the GM-13 Statistician position;

2)     Retaliated against her by requesting medical information to support her medical absence;

3)     Retaliated against her by failing to select her for the position of GM-14 Supervisory Statistician position; and

4)     Constructively terminated Franklin Mason.  Id.

As a result of his finding of discrimination, the AJ imposed the following

remedial actions:

1)   A retroactive promotion effective February 1, 1988, to the GM-13 Statistician position, with back pay, interest, increased pay and other benefits;

2)   A retroactive promotion to the GM-14 Supervisory Statistician position, effective October 8, 1989, with back pay, interest, increased pay and other benefits;

3)   Expungement of Franklin Mason's personnel records of references to the notice of proposed removal and correction of records from AWOL status to LWOP status;

4)   Payment of attorney fees and costs; and

5)   Posting by the Navy a Notice to Employees relating to their rights and the Navy's obligations under the "Federal equal employment opportunity law." Id.

Not surprisingly, on September 6, 1996, the Navy rejected the AJ's findings of discrimination, *in toto*, and, on that date, issued a Final Agency Decision. Final Agency Decision.

On October 31, 1996, Franklin Mason filed suit against appellee for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e.  On April 9, 1998, Judge Sullivan referred Franklin Mason's matter to Judge Facciola for settlement discussions for the first time.  After the filing of dispositive motions by the parties, Judge Sullivan denied the Navy's motion for summary judgment.

Following almost a year of discussion, by January 29, 1999, the Navy had

---

[3] Franklin Mason's Title VII claims are filed prior to the 1991 amendments.

proffered the broad outlines for a settlement of the case.  The Navy was prepared to offer $400,000.00 to Franklin Mason as back-pay and attorney fees.  The Navy also offered to create a position for Franklin Mason as a Senior Financial Analyst/Advisor to the NFAF Financial Manager.  The position was a grade GS-13, step 10.  The Navy provided Franklin Mason with a memorandum generally describing the job duties being offered to her. See Letter from A. Shoaibi to A. Hairston, dated Jan. 29, 1999, Pl. Exhibit 2.  Franklin Mason responded with concerns about the grade offered, as well as specific concerns about the reporting structure, her interaction with Savitsky and Hofman, the responsible managing officials under her EEOC claim, and who the:

> Commander would [be] evaluat[ing] her.  However, the position appears to work daily with the NFAF Financial Manager.  We do not want to assume to know the appropriate chain of command. We think it would be beneficial for Mrs. Franklin Mason to meet with the (sic) both of the persons who are in these positions.

Id.  Indeed, Franklin Mason was nonplussed.  "It didn't make sense to me and that's why I needed to have this clarification," Franklin Mason recalled.  "How can you have someone as a senior financial analyst/advisor that did not work for the Office of the Comptroller?"  TR.I at 39.  Accordingly, Franklin Mason's counsel expressed concern:

> About the language in the position description that indicates that the job may require 'substantial interaction with...comptroller personnel.'  We need to discuss this in further detail.  Obviously,

> if Mrs. Franklin Mason is required to work with Mr. Savitsky or
> any persons under his supervision, we have some concerns. We
> have expressed this concern previously and we need to make
> certain that Mr. Savitsky, and any other responsible management
> official from the past, do not have the ability to influence Mrs.
> Franklin Mason's job status.

Franklin Mason also raised issues related to receiving "appropriate training and education." Finally, Franklin Mason advised that the written agreement would need "acceptance by the Court." Letter from Hairston, Feb 5, 1999, Exhibit 3.

In response, the Navy assured Franklin Mason that the new job would "require no interaction with Mr. Savitsky or those under his supervision." Letter from Shoaibi, dated Feb 17, 1999; TR.I p. 17.

Franklin Mason insisted on a meeting with the NFAF managers prior to signing the settlement agreement. Memorandum from Hairston to Shioabi, dated February 23, 1999. Franklin Mason wanted to ensure that she was appropriately separated from the Office of the Comptroller, meet the new NFAF Financial Manager and NFAF staff and inquire about the opportunity to capture the GS-14 position lost in 1989. Memorandum from Hairston to Shoaibi, dated March 5, 1999. On March 3, 1999, a meeting was held for these purposes as well as to discuss the duties of the proposed job and reporting structure. The meeting included Franklin Mason and her husband Douglas, Barry Nelson and Larry

22

Penix, the NFAF managers, agency counsel Greg Smith, and Abbey Hairston, Franklin Mason's counsel.  Franklin Mason was informed of the job duties and responsibilities of the position.  As to the proposed reporting structure, Nelson and Penix told Franklin Mason that Armand Roduffe would be the supervisor for the new financial division within PM1. TR.I p. 30-32.  Nelson and Penix advised that Roduffe would be the GS-15 financial manager, and that there was also a financial manager, GS-14 position, that had not been filled. TR.I p. 34. Accordingly, Franklin Mason believed that although the new position was a GS-13, there would be an impending advancement opportunity. To Franklin Mason's surprise, Roduffe was not present at this meeting despite her explicit request for his attendance.  His absence was not explained. In fact, Roduffe had never even been hired. Id. at 34-35.

In explaining how Franklin Mason would be able to continue her career as a financial analyst/advisor without working with the Comptroller, Nelson admitted during the meeting that:

> PM-1 was creating, had created a new division and that Barry Nelson wanted to run his department as a business.  So therefore, he wanted to have his own people counting, his money, you know, his own professional financial discipline within the office.

TR.I at 33.  Franklin Mason understood, accordingly, that Roduffe or the NFAF financial manager would be her immediate supervisor:

He would help me accomplish any duties to fulfill the duties that
were in the job description. I would report to him. I would advise
him on whatever network or analysis that needed to be done. I
would present to him possibly studies or explaining in-depth what,
you know, what the effect of the variants would be, the monthly
variants would be between revenue and expenses and things of that
sort. Analysis of the variants, looking at the – reviewing of the
budget and trying to see if it was feasible and recommending that
certain things occur and, you know, having oversight of the 12's,
and of course, [] Bonnie Jackson would be under that financial office
also.

TR.I at 55. Given that the financial office was part of PM1, Franklin Mason's

concerns about reporting to the Comptroller were assuaged, in that she "didn't

have to rely on them [for] any information and that [she] would [be] working in the

separate financial office that Barry Nelson wanted and that he had already

designated Armand Roduffe as the head of his office." TR.I at 36.

Almost a year after the matter was first referred to Magistrate Facciola for

settlement, the parties reached an accord and a Stipulation of Settlement and

Order was executed by the parties on March 26, 1999. R. 44. By the Stipulation

Agreement and Order, the Navy agreed to reinstate Franklin Mason's employment

with the MSC, recognize her seniority status and appoint her as a "Senior

Financial Analyst/Advisor to the Financial Manager of the Naval Auxiliary Force

Program (PM1)" at a grade level 13, step 10.[4] R. 44 ¶2. The Order further

_____

[4] Significantly, a position description was not attached or incorporated into the
Stipulation.

24

stipulated that Franklin Mason would "not be required to work directly for or be supervised by William Savistsky, Robert Hofman, or Donald Petska in the normal course of her duties. R. 44, ¶9.  The Navy further agreed "that none of these individuals or any other personnel in the Office of the Comptroller shall be involved in any way with the formal evaluation of Plaintiff's work performance or in decisions made regarding Plaintiff's employment status." R. 44, ¶10.

The Stipulation of Settlement and Order further stated that it could "not be modified or waived unless such modification or waiver is reduced to writing and signed by each of the parties." R. 44, ¶16.

The Order then stated that "execution of this stipulation shall constitute a dismissal of this action with prejudice, effective upon approval by the Court, pursuant to Federal Rules of Civil Procedure 41(a)(i)(ii) (sic)." R. 44, ¶21.  Finally, the agreement stated, "Should any party breach terms of this Stipulation of Settlement, the other party shall have the right to seek enforced of the Stipulation with the Court including, but not limited to, monetary damages. R. ¶22.

On or about April 15, 1999, Judge Sullivan entered the Stipulation of Settlement and Order "Approved and so Ordered." R. 44, p. 6. Judge Sullivan's Order was entered on the docket as "STIPULATION filed and fiated."[5] R. 44

---

[5] Fiat is defined as an "order or decree." Black's Law Dictionary (8th ed. 2004).

### III.    Franklin Mason's Post-Settlement Employment.

In April 1999, Franklin Mason returned to work pursuant to the Stipulation of Settlement and Order.  Almost immediately, the entire Agreement collapsed because the Navy never assigned Franklin Mason any job duties and responsibilities that were consistent with any reasonable interpretation of the position offered in the Stipulation of Settlement and Order.  Upon arrival at the office, Franklin Mason did not report to Armand Roduffe.  Indeed, no one occupied the NFAF financial manager position nor had the NFAF "Financial Office" been created.  Instead, Franklin Mason received a few financial assignments from Office of the Comptroller with Lucy Austin, a GS-13 Business Manager from the Comptroller's office, Penix, and later Capt. Michael Herb after Penix left NFAF, acting solely as conduits.  Neither Penix nor Herb had any specialty or background in financial matters. Tr.I.

Unsurprisingly, Franklin Mason drifted aimlessly in PM1 without any direction or function.  According to Franklin Mason, Capt. Penix gave her and some assignments that "we were supposed to share, I guess, like sharing a job. It was her job." TR.I at 53.  According to Austin, management was not "sure what Franklin Mason was going to be doing when she came." TR.III at 117, 120. Franklin Mason was assigned to staff a secretarial station and given secretarial and receptionist duties, such as buzzing visitors into the office.  From April 1999 to

26

November 2004, Franklin Mason had received a total of five financial-related work assignments.    She was, further, denied the substantial training opportunities granted to her colleagues. Id.

Recalling the job description created by Greg Smith prior to the execution of the Stipulation of Settlement, because the financial office was never created, Franklin Mason "didn't get an opportunity to do most of the things that are in the job description." TR.I at 57.   In particular, Franklin Mason's assignments still came from Savitsky and the Office of Comptroller, and not the NFAF financial manager which did not exist as promised. TR.I at 58.  Otherwise, Franklin Mason either never did any work in those areas, or received a rare assignment that tangentially related to the duties she expected upon her return to work. TR.I at 58-61.  In short, instead of finding herself in a job where she could be successful and continue her career as a financial analyst/advisor, she found herself in a dead end job in which she received few, if any assignments. Id.  This was the very treatment that Franklin Mason had been subjected to and sought to remedy by her settlement with the Navy.

And, indeed, the Navy had never had any intention of giving her anything more than that. Agency counsel, Greg Smith, conceded that not only did the position *not* exist prior to offering it to Franklin Mason (TR.I at 188), it still was not created in the sense that all he intended to do was bring her "back on the rolls

and give[][her] work to do." TR.I at 189.  In sum, the Navy had no interest in

providing Franklin Mason with meaningful work and opportunity for advancement

and assumed she would be content so long as she "was paid." TR.I at 189.  And,

according to Smith, it made absolutely no difference who supervised her because

"in the Navy if the person above you hasn't reported for duty or they haven't been

hired, you report to the person they would report to." TR.I at 188.

In June 2001, a re-organization took place that eliminated even the pretext of

an independent financial office within PM1, resulting in the assignment of all

employees in the 500 series to the Office of the Comptroller. See e-mail from

Robert Hofman, dated June 19, 2001, Pl. Exhibit 16.  Franklin Mason was

classified in the 500 series, and her duties and supervision returned to the original

discriminating officials, William Savitsky, Robert Hofman, and Donald Petska.

TR.I at 80-81; TR.II at 238-39.  Nothing was done to determine if the

reorganization violated the Court's Order.  Thus, without the promised

independent financial office in PM1 (the PM1 Financial Manager), Franklin

Mason was doomed to have her employment status dictated by the Comptroller.

## IV.  Franklin Mason's Motions to Enforce the Settlement Agreement in the District Court.

On December 10, 1999, Franklin Mason filed her first emergency motion to

enforce the terms of the settlement agreement and order. R. 45.  On May 12, 2000,

Judge Sullivan denied without prejudice Franklin Mason's motion to enforce the terms of the settlement agreement after ordering the parties to engage in settlement negotiations. R. 57.

On May 7, 2001, Franklin Mason filed another motion to enforce the settlement agreement and order. R. 66. On October 24, 2001, Judge Sullivan denied Franklin Mason's motion to enforce the settlement agreement and order but granted her leave to file a supplemental motion to enforce the settlement agreement. On November 9, 2001, Franklin Mason filed her supplemental motion to enforce the settlement agreement and order and for sanctions. R. 74. By this motion, Franklin Mason asserted that the Navy had breached the following provisions of the Agreement:

> ¶2. Defendant agrees to reinstate Plaintiffs employment with the Military Sealift Command ("MSC"). Plaintiffs 23 years of seniority status is and will be recognized. Plaintiff shall be appointed as a Senior Financial Analyst/Advisor to the Financial Manager of the Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC. The position shall be graded a Level 13, Step 10. Plaintiff shall report for duty on April 12, 1999;

> ¶6. Defendant shall make a thrift savings account available to Plaintiff. Plaintiff shall be entitled to have an annual 5% deduction calculated for the time period from January 1990 through April 11, 1999. Based on this calculation, $36,000 shall be deducted from the back pay award of Plaintiff's settlement proceeds;

> ¶9. Defendant agrees to provide Plaintiff with orientation and other related activities to assist her in carrying out the duties and responsibilities of the position. Plaintiff is eligible to receive and

should be considered for any and all educational benefits afforded to personnel employed at her grade/level; and

¶10. Defendant agrees that Plaintiff shall not be required to work directly for or be supervised by William Savitsky, Robert Hofman, or Donald Petska in the normal course of her duties.  The Defendant further agrees that none of these individuals or any other personnel in the Office of the Comptroller shall be involved in any way with the formal evaluation of Plaintiff's work performance or in decisions made regarding Plaintiff's employment status. R. 74.

Pursuant to the trial court's retained authority to enforce its order, Franklin

Mason requested that the Navy:

[G]ive Plaintiff in the full and complete sense the position of Senior Financial Analyst/Advisor with the specified responsibilities and duties outlined by the Agency in its January 27, 1999 memorandum. Moreover, Plaintiff is to be given a full, complete and professional orientation to explain the workings and expectations associated with this position, which shall include performance of *business management functions.*  As well, all managers in her chain of command shall receive a full and detailed briefing from the Agency and its attorneys regarding the terms and conditions of this Agreement and this court 's expectation that the Agreement shall be implemented *immediately* and without any retaliation or negative professional or workplace repercussions.  If Defendant is incapable for any reason of achieving this, then the Defendant shall propose to this court a reassignment of  Plaintiff to a position similar in nature, where she can be assured of a fair and impartial (non-hostile) assumption of work related duties and responsibilities, and pursuant to which all other provisions of the Agreement will be preserved;

The Agency should reconcile all issues related to Plaintiff's TSP and retirement accounts consistent with the April 9, 1999 Agreement and the concerns referenced here.  To wit, the Agency should provide to Plaintiff a full status report regarding these funds;

Further, the Agency shall take all steps to ensure that education and

training decisions regarding Plaintiff are made in a fair and impartial manner and that she be given the treatment caused by Defendant 's actions, and further Defendant shall compensate Plaintiff for the pain and suffering that she experienced as a result of Defendant's non-implementation of the Agreement;

Plaintiff has been required to retain legal counsel at her own expense. Should she prevail in this manner, the court should require the Government to pay all legal fees and costs; and

Lastly, the court should require the Government to submit a quarterly status report regarding its compliance with this court's order for a 48 month period. R. 74.

On July 8, 2002, Judge Sullivan recused himself from the matter, and the Honorable Judge Richard Roberts was reassigned the case. On January 30, 2003, Judge Roberts referred Franklin Mason's motion to Magistrate Judge John M. Facciola for report and recommendation.

Franklin Mason began to experience a recurrence of the medical condition that required her to take leave in 1988 because of the on-going stress, and took another extended medical leave. By June 2004, *none* of the issues relating to the Navy's violation had been resolved, and Franklin Mason was constructively discharged from the Navy that month for the second time.

Evidentiary hearings on Franklin Mason's motion were held on February 2, 3, 4 and April 8, 2005 before Magistrate Judge Facciola. During the course of the hearings, Magistrate Judge Facciola requested briefing on whether the district court possessed jurisdiction the adjudicate Franklin Mason's motion to enforce Judge

Sullivan's Order.  Franklin Mason argued that remedies for the violation of the court order should lie in tort, Title VII remedies and the court's power to sanction the Navy for violation of its order.

On March 21, 2006, the magistrate judge filed a Report and Recommendation on Franklin Mason's motion to enforce the settlement agreement and order.  As an initial matter, magistrate judge found that the District Court possessed jurisdiction to adjudicate Franklin Mason's motion.[6]  In so ruling, the Magistrate, relying on *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994), *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir.) and *Hansson v. Norton*, 411 F.3d 231, 232 (D.C. Cir. 2005) found:

> Paragraph 21 of the settlement agreement deems the stipulation itself an order of dismissal. Thus, compliance with the settlement agreement is necessarily a term of that order. Second, the settlement agreement/dismissal order includes an express stipulation retaining this court's jurisdiction. According to paragraph 22 of the parties' settlement agreement, 'should any party breach terms of this Stipulation of Settlement, the other party, shall have the right to seek enforcement of the Stipulation with the Court including, but not limited to, monetary damages.' Stipl 22. This is an express stipulation of retention of jurisdiction "with the Court." Finally, and as noted above, the settlement agreement is not just embodied in the dismissal order, it is the dismissal order. *The court cannot imagine what more the parties could have done to ensure the court's retention of jurisdiction over this matter or to convey their express intent that the court do so*. (Emphasis Added.) R. 144.

---

[6] Both Franklin Mason and the Navy argued that jurisdiction in the District Court were appropriate.

Addressing the merits of Franklin Mason's motion, magistrate judge Facciola found that the Navy had "substantially breached" the Consent Decree from the time of Franklin Mason's reinstatement to Penix's departure. Specifically, the magistrate found that Franklin Mason's:

> [I]nability to secure assignments that were consistent with the position description was a result of MSC's failure to create the GS-15 Financial Manager position that I have found the parties anticipated would come into creation when [Franklin Mason] returned to work. That failure not only affected what plaintiff was asked to do but the circumstances under which she did it, including whom she reported to [and] the nature of her supervision. R. 144.

The magistrate, however, did not find that the Navy had breached its settlement obligation to ensure that Savistsky, Hofman or Petska were never in a position to effect the terms and conditions of her employment insisting that her position that she be "free of all contamination by the Comptroller's Office was unreasonable." R. 144 p. 22. Finally, the magistrate determined that Franklin Mason was entitled to "nominal damages." R. 144, p. 29. Franklin Mason submitted objections to the findings in the Report and Recommendation on May 3, 2006. R. 150.

On May 22, 2009, about three years after the magistrate issued its Report and Recommendation, the district court rejected the magistrate's determination that it had jurisdiction to hear Franklin Mason's motion and transferred her motion to the United States Court of Federal Claims. *Franklin-Franklin Mason v. Penn*, 616 F.Supp.2d 97 (D.D.C. 2009); R. 156. The trial court found Franklin

Mason's claim of damages for a breach of the settlement agreement was a claim "for liquidated or unliquidated damages" for a breach of a contract with the United States, conferring jurisdiction in the Court of Federal Claims under the Tucker Act, 28 U.S.C. §1491(a)(1). *Id.*  After determining that the Stipulation between Franklin Mason and the Navy was a "contract," the trial court rejected the Magistrate's reliance on *Kokkonen* and *Rochon* because none of the parties in those cases were the "United States" or "a federal government entity." Accordingly, the trial court held that the Tucker Act prevented the parties through a settlement agreement from "confer[ring] jurisdiction on a court over a claim that is exclusively the province of another court." *Franklin-Mason v. Penn*, 616 F.Supp.2d at 101, *citing Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).

## V.  Litigation in the Court of Federal Claims.

On September 29, 2009, Franklin Mason's motion was transferred and assigned to the Honorable Judge Susan G. Braden.  On October 27, 2009, Franklin Mason filed an "Amended" Transfer Complaint in the Court of Claims, alleging violations of Title VII, as well as breach of the Final Settlement Order.

The Navy filed a motion to dismiss the transfer complaint on February 26, 2010, arguing that the Settlement Agreement was an Order of the District Court or a "Consent Decree" over which the Court of Claims had no jurisdiction.  Judge

34

Braden agreed with both parties that jurisdiction was proper in the district court, and on July 23, 2010, transferred Franklin Mason's matter back to the United States District Court for the District of Columbia.  In so ordering, the Claims Court held that the terms of the Stipulation of Settlement between Franklin Mason and the Navy was incorporated in the final order of dismissal which "specifically reserved jurisdiction over any claims of breach of the Final Order." P. 6.

On January 27, 2012, Judge Roberts issued a Final Order, denying Franklin Mason's Motion to enforce the settlement agreement and order and dismissing the transfer complaint to the extent that it proffered claims that were "extinguished" by the settlement of the underlying Title VII case.  The trial court found that the conflict between the two Courts as to the remaining "contract damages" claims could only be resolved by the court of appeals. R. 164, 2-3.

## SUMMARY OF ARGUMENT

Pursuant to *Kokkonen v. Guardian Life Insurance Co.,* 511 U.S. 375 (1994), the district court had ancillary jurisdiction to enforce a consent decree that it entered in settling and dismissing Franklin Mason's Title VII lawsuit. Further, the Navy violated that order when it, in bad faith, failed to provide Franklin Mason with a position remotely consistent with the job contemplated in the settlement and forced her to accept assignments and supervision from the responsible managing officials to her Title VII claims.

# ARGUMENT

## I.      Standard of Appellate Review

The issue of the court's subject matter jurisdiction is a question of law requiring de novo review by the Court of Appeals. *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 190-191 (D.C. Cir. 2004).  With regard to the district court's review on the merits relating to enforcing the settlement, this Court reviews factual findings for clear error and legal issues *de novo*. *Serono Lab. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

## II.     THE DISTRICT COURT POSSESSED INHERENT POWER TO ENFORCE FRANKLIN MASON'S TITLE VII CONSENT DECREE AGAINST THE UNITED STATES.[7]

It cannot now be disputed that for 20 years, Roxann Franklin Mason navigated a white male patriarchy at the United States Navy that repeatedly thwarted her ambition and callously punished her efforts for redress by maliciously orchestrating her termination and shipping her off to professional purgatory.  By her motion to enforce the court's Stipulation Order, Franklin Mason has proffered substantial evidence that the Navy settled her case by, well, thwarting her ambition and shipping her off to professional purgatory.  Despite having voluntarily entered

---

[7] The trial court also dismissed the transfer complaint without making any factual findings as to those specific claims or briefing by the parties, and Franklin Mason submits that the dismissal of the transfer complaint should be remanded back to the trial court.

37

into a consent order that imposed on it good faith efforts to provide Franklin Mason with meaningful redress, the Navy has not been made to pay for its protracted recalcitrance by the court.  Partly this has been the product of the passage of time in which her efforts to enforce compliance with the order out lasted Franklin Mason's reasonable ability to withstand the Navy's continuing discriminatory treatment.

Now, nearly ten years after Franklin Mason's first enforcement motion was filed, and a full three years after the magistrate's Report and Recommendation was entered, the trial court has erected yet another highly prejudicial barrier to justice by asserting it has no jurisdiction to enforce, in any manner, its *own* order and dismissing Franklin Mason's transfer complaint.  The trial court is wrong.

In *Kokkonen v. Guardian Life Insurance Co.,* the Supreme Court held that federal district courts retain ancillary jurisdiction over the breach of a settlement agreement where "the parties' obligation to comply with the terms of the settlement agreement [was] made apart of the order of dismissal." 511 U.S. 375, 379-380 (1994).  By *Kokkonen*, the Supreme Court underscored the district court's inherent power to protect its proceedings, vindicate its authority and effectuate its decrees. *Id.*  Indeed, "even after final judgment a district court retains ongoing jurisdiction to consider violations of its orders and judgments." *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990).

Under the Tucker Act, however:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. §1491(a)(1). Specifically, the Tucker Act permits three kinds of claims against the government: (1) contractual claims, (2) noncontractual claims where the plaintiff seeks the return of money paid to the government and (3) noncontractual claims where the plaintiff asserts that he is entitled to payment by the government. *Id*. Jurisdiction over Tucker Act claims is exclusively vested in the United States Court of Federal Claims for claims in excess of $10,000, while another statutory grant of jurisdiction—the so-called "Little Tucker Act"—allows the court to entertain similar suits against the United States for claims of less than $10,000 concurrently with the federal district courts. 28 U.S.C. §1346.

This Circuit, accordingly, has repeatedly held that an action for breach of a *settlement agreement,* that has not been incorporated into a judicial order nor enforcement jurisdiction was expressly retained by the district court, against the federal government must be brought in the Court of Federal Claims for claims seeking money damages over $10,000.00. *Greenhill v. Spelling,* (D.C. Cir. 2007); *Hansson v. Norton*, 411 F.3d 231, 232 (D.C. Cir. 2005); *Brown v. U.S.*, 389 F.3d

1296, 1297 (D.C. Cir. 2004).  This Circuit has, nevertheless, acknowledged that there may be claims related to a breach of a settlement agreement that may not fall within the jurisdiction of the Court of Federal Claims if the primary thrust of the complaint "sounds in tort." *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir 2006).

The federal government, though, frequently agrees to settle suits against it by entering into consent agreements or decrees and submitting to judicial enforcement of those decrees. *See e.g., Women's Equity Action League v. Bell*, 743 F.2d 42 (D.C. Cir. 1984); *National Audubon Society v. Watt*, 678 F.2d 299 (D.C. Cir. 1982).  To be sure, there is a long and important history of consent decrees in civil rights litigation, in particular, and the continuing enforcement jurisdiction provided by a consent decree "is the norm (and often the motivation) for the parties' settlement." *See EEOC v. Product Fabricators*, 666 F.3d 1170 (8th Cir. 2012).  The parties to a consent decree expect and achieve a continuing basis of jurisdiction to enforce terms of the resolution with the court entering the order. *United States v. Miami*, 664 F.2d 435, 439-40 (5th Cir. 1981)(en banc)(concurring opinion of Rubin, J.).

Here, Franklin Mason and the Navy entered into a consent decree approved and "fiated" by Judge Sullivan.  The order expressly retained jurisdiction for purposes of enforcement, including the potential imposition of monetary damages. *See Buckhannon Board & Care Home v. West Virginia Dep't of Health and*

40

*Human Services*, 532 U.S. 598 (2001); *Smyth v. Rivero*, 282 F.3d 268 (4th Cir. 2002). In short, it was not a private settlement. The magistrate indeed proffered that the parties could not have been more explicit that they desired and expected that the agreement would be "reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 378 (1992); *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993). Simply put, the parties' Stipulation Agreement and Order more than passed the test enunciated by *Kokkonen* to serve as a basis for inherent jurisdiction.

The trial court, however, dismissed its ancillary powers to enforce its own order against the Navy. The trial court reasoned that the settlement agreement between Franklin Mason and the Navy was a "contract," the terms of which could only be enforced in the Court of Federal Claims. *Id.* at 101. Of course, the terms of the "contract" only had force and effect *because* it was an order of the court, and if the trial court did not have the power to enforce its own order, nothing in the Tucker Act would have provided the Claims Court with that power either. Simply put, the ancillary jurisdiction retained by the district court under *Kokkonen* explicitly displaced Tucker Act jurisdiction. *United States v. Bormes*, __ U.S. ___

(2012).[8]  Indeed, this Circuit has suggested that it would have upheld the exercise of ancillary jurisdiction over a settlement agreement against the Secretary of Agriculture had the district court retained jurisdiction in a manner consistent with *Kokkonen*. *Shaffer v. Veneman*, 325 F.3d 370 (D.C. Cir. 2003); *see also VanDesande v. United States,* 673 F.3d 1342 (Fed. Cir. 2012); *Stewart v. O'Neill*, 225 F. Supp 2d 6 (D.D.C. 2002).

Moreover, Franklin Mason's original motions did not even request damages other than sanctions and attorney fees.  Instead, Franklin Mason sought to invoke the court's contempt powers to coerce specific performance of the Navy's non-monetary promises, as well as imposing compliance reporting on the Navy.  Years went by and, without the realistic threat that the district court would actually use its coercive powers, the Navy did nothing to fulfill its court order obligations.

The trial court's curious premise that it could vindicate its authority or effectuate its decree through its jurisdiction over Franklin Mason's new Title VII claim is unpersuasive and hardly an effective alternative to the swift remedial authority clearly anticipated by the parties.  To that end, that Franklin Mason has been substantially prejudiced by not only the delay in adjudicating her motion, but

---

[8] Two unpublished opinions of the Federal Circuit have held that the Court of Federal Claims does *not* possess jurisdiction to enforce consent decrees against the federal government. *Mynard v. Office of Personnel Mgmt.*, 2009 WL 3320583 at *5 (Fed. Cir. 2009); *Blodgett v. United States*, 101 F.3d 713 (Fed. Cir. 1993).

the eleventh-hour determination by the trial court that it lacked jurisdiction cannot be overstated.  In addition to the substantial legal fees incurred in pursuing her substantive rights, the delay in getting the meaningful relief from the court that she expected when she agreed to settle her case under court supervision effectively ended her professional career.  The specter of essentially re-litigating her motion in the Court of Claims after ten years in this jurisdiction and countless hours of legal fees incurred is, in a word, cruel.  Indeed, the uncertainty that her ability to get relief from what she believed to be a fully enforceable would unfortunately and not unreasonable chill any future efforts to settle.

In short, the trial court has jurisdiction to enforce its own order settling and dismissing Franklin Mason's underlying Title VII case, and its determination to the contrary must be reversed.

## III.   THE NAVY VIOLATED THE CONSENT DECREE WHEN IT, IN BAD FAITH, INDUCED HER TO SETTLE HER TITLE VII CASE WITH ILLUSORY PROMISES OF A MEANINGFUL POSITION SEGREGATED FROM HER TORTFEASORS THAT DID NOT EXIST AND THE NAVY ADMITS IT HAD NO INTENTION OF PROVIDING.[9]

Prior to filing her Title VII case against the Navy, an EEOC administrative judge found, after hearing testimony on her claim, that Franklin Mason had proven

---

[9] To the extent that the trial court's final order relating to Franklin Mason's motion to enforce the stipulation order can be construed as a denial on the merits, Franklin

the substance of her claims of discrimination by the Navy, including that it had unlawfully failed to promote her twice, had retaliated against her by repeatedly rejecting her medical leave documentation and charging her with AWOL and engaging in a pattern of harassment that led to her constructive termination. For those violations, the AJ awarded Franklin Mason substantial back-pay.

By January 1999, after Franklin Mason filed suit, Judge Sullivan had denied the Navy's summary judgment motion as to her claims for failure to promote, retaliation and constructive discharge. R. 38. In short, the Navy was facing trial on a race and sex discrimination complaint in the District of Columbia that had a potential back-pay award of well over $1,000,000.00. Instead of submitting to that potential exposure and public embarrassment, the Navy conjured up a proposal to pay Franklin Mason a fourth of that amount and give her a job with a fancy title and dreams of advancement. For good measure, the Navy ceded to Franklin Mason's reasonable demand that her tormentors have nothing to do with her.

Franklin Mason, however, adduced at the hearing on her motion that the promised job and professional opportunities were simply an illusion. Moreover, the agency counsel responsible for negotiating the agreement confirmed what Franklin Mason already knew; the agency's intent was merely to pay her for doing

---

Mason submits argument addressing the merits of her claim that the Navy violated the trial court's order.

nothing until, as she had before, she got get sick and quit.  Most important, the Navy did not segregate Franklin Mason from being effectively supervised and assigned work by her prior supervisors.

The magistrate judge agreed with Franklin Mason that the Navy had materially breached the agreement by failing to create a position that even resembled the job that induced her to settle her Title VII case. R. 144.  The magistrate determined, though, that the assignment of financial work that was ultimately controlled and directed by William Savitsky was not a violation of the settlement.  The magistrate's finding was not supported by the evidence.[10]

After all, Franklin Mason proffered at the hearing her substantial concerns about interacting with Savistsky, Hofman and Petska in her new job.  R. 144, p. 21.  To be sure, the Navy knew those concerns were of the essence to Franklin Mason and were what led it to purportedly create a job for Franklin Mason *outside* of the Comptroller's office altogether.   That the Navy was unable to abide by that obligation under the settlement was because it simply did not *create* the outside job, not because Franklin Mason's clearly stated expectations were "unreasonable."   In short, the Navy violated a material term of the settlement order, and the magistrate erred in finding to the contrary.

---

[10] Franklin Mason also contests the magistrate's findings relative to her TSP account and the expungement of her personnel file.

Finally, the magistrate judge's determination that Franklin Mason was only entitled to nominal damages for the Navy's flagrant disregard for the court's authority, is clearly erroneous.  As an initial matter, Franklin Mason adduced credible evidence from Greg Smith that the position created for her was nothing more than a title that he made up.  And, indeed, Franklin Mason job *was* just a title and nothing more.  In finding that Franklin Mason was entitled to only nominal damages for the Navy's violation of the court's own order, the magistrate's answer to her was, incredibly, to return the settlement money she received and go to trial.  R. 144, p. 26.  Alternatively, the magistrate proffered that Franklin Mason could invoke the "court's contempt power" and "demand that [the Navy] give her the job she bargained for." R. 144, p. 25-26.  Of course, for over five years Franklin Mason had been seeking just such a remedy from the court, to utterly no avail.  Finally, the magistrate found that Franklin Mason's position that she was entitled to damages representing the difference in the government's back-pay calculation had she gone to trial and the amount that she settle for "offend[ed] every pertinent legal principle." R. 144, p. 25.  The most pertinent legal principle wholly ignored by the magistrate was the court's power to impose monetary damages, not only under contract, but under tort *and* the court's inherent authority to enforce its orders or impose sanctions for violations of its orders, as well.

Indeed, Franklin Mason's motion specifically requested sanctions and fees.

46

It is undisputed that the Navy failed to abide by its obligations even facing contempt or sanctions by the court.    Moreover, Franklin Mason proffered a compelling case that the Navy's treatment *under* the settlement agreement mirrored its discriminatory treatment of her *before* the settlement agreement.  Put simply, the Navy has paid no penalty whatsoever for its pathetic recalcitrance, and the magistrate clearly erred in insisting that it *should not*.

WHEREFORE, Appellant Roxann Franklin Mason respectfully requests that the trial court's Order denial of her Motion to Enforce the Consent Decree and dismissing her transfer complaint be reversed.

Respectfully submitted,

/s/ Lisa Alexis Jones
Lisa Alexis Jones, Esq.
1230 Avenue of the Americas
7th Floor
New York, N.Y.  10020
(646) 756-2967
(888) 755-6778 Facsimile
orbitcv@erols.com

*Counsel for Plaintiff-Appellant*

Dated:        November 19, 2012

47

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 19th day of November 2012, I filed with the Clerk's Office of the United States Court of Appeals for the District of Columbia Circuit the required number of copies of Appellant's Final Brief and sent such Briefs via first class mail, postage prepaid, to:

<u>/s/ Lisa Alexis Jones</u>
Lisa Alexis Jones, Esq.

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS</u>
## <u>AND TYPE STYLE REQUIREMENTS</u>

The undersigned counsel of record for Appellant Roxann Franklin Mason certifies pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) that the foregoing Brief contains 10,253 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the Word Count feature of Microsoft Office Word 2003, and that this brief has been prepared in 14-point Times New Roman.

<u>/s/ Lisa Alexis Jones</u>
Lisa Alexis Jones, Esq.

49